**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT MILAN, KATHLEEN KLEINMANN and TRIPIL SERVICES, <br><br> Plaintiffs, <br><br> vs. <br><br> KYRK A. PYROS, RONALD DEVERSE, PYRSQUARED GROUP, INC. PYRSQUARED MANAGEMENT CO., INC. and K.P. BUILDERS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) **Civil Action No. 08-320** ) ) ) ) ) ) ) ) ) |

**Opinion and Order**

Cohill, D.J.

On March 3, 2008, Plaintiffs Robert Milan, Kathleen Kleinmann, and TRIPIL Services filed this disability discrimination action against Defendants Kyrk A. Pyros, Ronald Deverse, Pyrsquared Group, Inc., Pyrsquared Management Co., Inc., and K.P. Builders, Inc., claiming that they violated their rights by discriminating against Plaintiffs in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq.* ("FHAA"). On March 24, 2008, Plaintiffs filed a motion for a Temporary Restraining Order seeking to enjoin Defendants from interfering in Plaintiffs' leasehold and possessory interest in Apartment Units in the George Washington Hotel, 60 South Main Street, Washington, Pennsylvania, 15301. The Court entered a Temporary Restraining Order on March 25, 2008.

A hearing to determine if a preliminary injunction should issue was held before this Court from April 1, 2008 through April 4, 2008. Plaintiff Robert Milan was represented by Robert Jenner, Esquire, and Plaintiffs Kathleen Kleinmann and TRIPIL Services were represented by Edward Olds, Esquire and Richard Matesic, Esquire. Defendants were represented by Steven Engel, Esquire, and William Weiler, Jr., Esquire.

At the conclusion of the hearing, the parties were asked to submit proposed findings of fact and conclusions of law. Oral argument was held on April 16, 2008, and this matter is now ripe for resolution. For the reasons that follow we will grant Plaintiffs' motion for a preliminary injunction in favor of Ms. Kleinmann and TRIPIL Services and deny Plaintiff's motion for a preliminary injunction in favor of Mr. Milan.

## I. <u>FACTS</u>

The George Washington, L.P., a Pennsylvania limited partnership, is the owner of the George Washington Hotel (hereinafter the "George Washington" or the "Hotel"), located at 60 South Main Street, Washington, Pennsylvania. Defendants Kyrk Pyros and Pyrsquared Management Co., Inc., are limited partners of the George Washington, L.P. Pyrsquared Management Company is the managing partner of the George Washington L.P., and Kyrk Pyros is the president of Pyrsquared Management Company, making Mr. Pyros the de facto owner and operator of the Hotel. Defendant Ronald Deverse is the operations manager of the Hotel. The George Washington operates, in part, a multi-unit apartment complex, and houses two restaurants and a bar. Howard Martin is the Hotel's security/maintenance supervisor. Harry Elenitsas works security at the hotel. Larry Hopkins is a cook/dishwasher working in the kitchen of the hotel.

Plaintiff Robert Milan is a resident of the George Washington residing in Unit 501. He has the condition of quadriplegia and uses a wheelchair. Daisy is Mr. Milan's service dog.

Plaintiff Kathleen Kleinmann is a resident of the George Washington residing in Unit 802. She has Muscular Dystrophy, and uses a wheelchair. Ms. Kleinmann is the Chief Executive Officer of TRIPIL Parent, the corporate parent of Plaintiff TRIPIL Services. TRIPIL is an acronym standing for Tri-County Patriots for Independent Living. TRIPIL Services is a private non-profit corporation, organized under I.R.C. § 501(c)(3), that, among other things, promotes independent living through direct services to disabled persons and advocates on behalf of disabled individuals. TRIPIL Services leases Unit 511 of the Hotel for use as a transitional living space for disabled

persons moving from institutional care to independent living. Michael Cogley is the Executive Director of TRIPIL Services, and Nicole Headlee is his executive secretary.

We will confine our recitation of the relevant events to the time period necessary for resolution of the instant motion. In doing so we are omitting some of the events that occurred after January 9, 2008, but will refer to subsequent events in the body of our opinion as necessary.

On December 25, 2007, Mr. Milan sought Ms. Kleinmann's assistance in finding new housing as he was presently in the hospital and knew that he would not be returning to his former residence when he was discharged. (Transcript of hearing, April 1, 2008, testimony of Kathleen Kleinmann, at 94 (Doc. 31) (hereinafter "Kleinmann April 1, 2008".) Ms. Kleinmann suggested to Mr. Milan that she inquire at the George Washington to see if any apartments were available. (Kleinmann April 1, 2008, at 94.) Mr. Milan agreed and stated that he desired a month-to-month lease with a rent no greater than $400. (Kleinmann April 1, 2008, at 95.) Ms. Kleinmann knew that Mr. Milan's requests would have to be approved by management at the George Washington since the normal lease was for one year and the lowest rent on an efficiency unit was about $450. (Kleinmann April 1, 2008, at 96.) She also told Mr. Milan that she thought he would like living at the George Washington and eventually would want to sign a long-term lease. (Kleinmann April 1, 2008, at 95.)

On December 26, 2007, Ms. Kleinmann went to see Mr. Deverse to explain that she had a friend who was looking for month-to-month lease for around $400 rent per month, and that if it worked out he would sign a year lease. (Kleinmann April 1, 2008, at 95-96.) She asked Mr. Deverse if that would be possible, and he stated that he would have to seek approval from Mr. Pyros. (Kleinmann April 1, 2008, at 96.)

On December 27, 2007, Mr. Deverse arranged for Ms. Kleinmann to view several vacancies, after which Ms. Kleinmann decided that efficiency units 501 and 1005 might be suitable for Mr. Milan. (Kleinmann April 1, 2008, at 96-97.) She took photographs of the units and emailed the photographs to Mr. Milan. (Kleinmann April 1, 2008, at 97.) Mr. Milan reviewed the

photographs and decided that he would like to move in to 1005.  (Transcript of hearing, April 2, 2008, testimony of Robert Milan, at 96 (Doc. 25) (hereinafter "Milan April 2, 2008".)

In late December, 2007, Ms. Kleinmann traveled to Ohio to visit with her friend, Roland Sykes.  (Kleinmann April 1, 2008, at 99-100.)  Mr. Sykes, who was also disabled, was suffering from cancer at the time and was being assisted by a disabled friend.  (Kleinmann April 1, 2008, at 109-110.)  Due to snow, Ms. Kleinmann was unable to return to the Hotel in time to pay her January rent.  (Deverse April 3, 2008, at 176.)  On January 1, 2008, she telephoned Mr. Deverse to tell him that she was snowed-in and that she would pay her rent when she returned.  (Kleinmann April 1, 2008, at 110, 110; Deverse April 3, 2008, at 176.)  She also told Mr. Deverse that she planned to bring Mr. Sykes into her apartment as a guest for a short time as his caregiver had recently died and Mr. Sykes was in need of care.  (Kleinmann April 1, 2008, at 111.)

On January 3, 2008, Ms. Kleinmann telephoned Mr. Deverse from Ohio to ask if Mr. Pyros had agreed to the special conditions Mr. Milan requested.  (Kleinmann April 1, 2008, at 98.)  Mr. Deverse responded that Mr. Pyros wanted to know the reason for Mr. Milan's housing need.  (Kleinmann April 1, 2008, at 98.)  Ms. Kleinmann explained that Mr. Milan and his wife were separating and Mr. Milan would not be returning to his former residence.  (Kleinmann April 1, 2008, at 98.)  Mr. Deverse then told Ms. Kleinmann that he would relay this information to Mr. Pyros.  (Kleinmann April 1, 2008, at 98.)

On the morning of January 4, 2008, Ms. Kleinmann again telephoned Mr. Deverse who stated that Mr. Pyros had given his consent for a month-to-month lease to last for six months, with a $400 rental fee per month and the condition that at the end of the six months Mr. Milan must decide to either sign a year lease or leave.  (Kleinmann April 1, 2008, at 99.)  Mr. Deverse also stated that Mr. Milan could sign a lease on Monday January 7, 2008 when Mr. Deverse was in the office.  (Kleinmann April 1, 2008, at 102.)

During this telephone conversation, Ms. Kleinmann also told Mr. Deverse that she would need extra sets of keys for caregivers for Mr. Sykes, who she was bringing to stay with her for a short time.  (Kleinmann April 1, 2008, at 111.)  Mr. Deverse told Ms. Kleinmann that they would

talk about the keys when she returned to the George Washington. (Kleinmann April 1, 2008, at 111.)

After speaking with Mr. Deverse, Ms. Kleinmann telephoned Michael Cogley and asked him to facilitate Mr. Milan's move-in with regard to arranging transportation and getting the keys to the apartment. (Kleinmann April 1, 2008, at 100-101;, Transcript of hearing, April 2, 2008, testimony of Michael Cogley at 41 (Doc. 25).) Mr. Cogley first tried to reach Mr. Deverse by telephone, and when he was unable to reach him, he walked to the George Washington to speak with Mr. Deverse. (Cogley, at 41-42.) Mr. Deverse confirmed to Mr. Cogley that Mr. Pyros had agreed to rent an apartment unit to Mr. Milan. (Cogley, at 42-43.) Mr. Deverse also said that Mr. Milan's preferred apartment, Unit 1005, was not ready as it needed to be painted. (Cogley, at 42-43.) However, Mr. Milan could temporarily move into Unit 501 until Unit 1005 was ready. (Cogley, at 42-43.) Finally, Mr. Deverse told Mr. Cogley that he would prepare the appropriate lease and fax it to Mr. Cogley's executive assistant, Nicole Headlee, and that keys would be made available for Mr. Milan's move-in date when necessary. (Cogley, at 43.)

Once Mr. Milan was informed that his request for a $400 month-to-month lease had been approved he prepared to move in on Saturday, January 5, 2008, since he was being discharged from the hospital. (Milan April 2, 2008, at 97-98; Cogley, at 45.) At the direction of Mr. Cogley, Ms. Headlee telephoned Mr. Deverse and explained to him that Mr. Milan needed to move in the next day, Saturday, January 5, 2008. (Transcript of hearing, April 2, 2008, testimony of Nicole Headlee, at 73 (Doc. 25).) Mr. Deverse consented to the move-in date, and stated that he would leave keys with the night security guard. (Headlee, at 73.)

Mr. Milan arrived at the George Washington with his service animal, Daisy, in the late afternoon or early evening on January 5, 2008. (Milan April 2, 2008, at 100.) He received the key to Unit 501 from the security guard, Howard Martin, and moved in to the unit. (Milan April 2, 2008, at 100; Transcript of hearing, April 3, 2008, testimony of Howard Martin, at 4 (Doc. 32).) Mr. Martin saw Daisy get off the bus with Mr. Milan. (Martin, at 5.) Later that evening, Harry Elenitsas, a security guard, observed a women with a dog enter the elevator in the George

5

Washington.  (Transcript of hearing, April 3, 2008, testimony of Harry Elenitsas, at 61 (Doc. 32).)
The next morning he telephoned the Hotel to notify management that a dog was in the building.
(Elenitsas, at 62.)  Later that afternoon he told Mr. Martin about the dog.  (Elenitsas, at 62.)  He
did not attempt to ascertain whose dog it was or otherwise identify the dog.  (Elenitsas, at 62.)

At the same time that Ms. Kleinmann was talking to Mr. Deverse about Mr. Milan's
potential tenancy at the George Washington she also spoke with Mr. Deverse about TRIPIL's
interest in obtaining another apartment at the George Washington to use as a second transitional
apartment for TRIPIL's clients.  (Kleinmann April 1, 2008, at 103-104.)  TRIPIL already had one
transitional apartment at the George Washington unit occupying Unit 511, which was across the
hall from Unit 501.  (Kleinmann April 1, 2008, at 104-105.)  Ms. Kleinmann sought to obtain Unit
501 for TRIPIL's use in light of its proximity to its already existing transitional unit.  (Kleinmann
April 1, 2008, at 105-106.)  At the time Ms. Kleinmann spoke to Mr. Deverse about the possibility
of obtaining a second transitional unit she explained to him that it was not urgent.  (Kleinmann
April 1, 2008, at 105.)  To obtain a second unit would require the approval of TRIPIL's Board, so
Ms. Kleinmann considered her discussions at the preliminary stage, but wanted a lease to take to
the Board.  (Kleinmann April 1, 2008, at 105-106.)

Ms. Kleinmann returned to the George Washington in the evening on January 5, 2008,
along Mr. Sykes.  (Kleinmann April 1, 2008, at 109.)

On Monday, January 7, 2008, Ms. Kleinmann went to the George Washington after lunch to
pay her January rent.  (Kleinmann April 1, 2008, at 107.)  While she was paying her rent, Mr.
Deverse arrived and told Ms. Kleinmann that he had the leases for the two units but wanted to
clarify that he had prepared them correctly.  (Kleinmann April 1, 2008, at 107.)  He orally stated to
Ms. Kleinmann that Mr. Milan would be taking Unit 501 and TRIPIL would be taking Unit 1005.
(Kleinmann April 1, 2008, at 107.)  Ms. Kleinmann corrected Mr. Deverse and stated that it was
the reverse: Mr. Milan would be taking Unit 1005, and TRIPIL would be taking Unit 501.
(Kleinmann April 1, 2008, at 107.)   In response, Mr. Deverse noted that he had to correct the
leases.  (Kleinmann April 1, 2008, at 107.)  During this conversation, Mr. Deverse also asked Ms.

Kleinmann how many new keys she wanted, and told Ms. Kleinmann that he would need the number off her key in order to obtain identical new keys. (Kleinmann April 1, 2008, at 112.)

Later that afternoon Mr. Milan arrived in the lobby with Daisy and introduced himself to Mr. Deverse. (Milan April 2, 2008, at 104-105.) While they spoke Daisy was lying down next to Mr. Milan's wheelchair out of sight of Mr. Deverse. (Milan April 2, 2008, at 104.) Mr. Milan asked Mr. Deverse when Unit 1005 would be ready, and Mr. Deverse stated that it should be ready Wednesday morning. (Milan April 2, 2008, at 104-105.) Mr. Milan stated that he was really looking forward to moving into the unit. (Milan April 2, 2008, at 105.) After their conversation, Mr. Milan left and Daisy got up to follow him, thereby allowing Mr. Deverse to see that Mr. Milan was accompanied by a dog. (Milan April 2, 2008, at 105.)

On Tuesday, January 8, 2008, Mr. Pyros and Mr. Deverse together telephoned TRIPIL Services to speak to Mr. Cogley. (Cogley, at 46; Headlee, at 76, 85) Mr. Deverse and Mr. Pyros initially told Ms. Headlee, who answered the telephone, that they had a problem with the pet, Mr. Milan's pet dog. (Headlee, at 85.) Ms. Headlee informed Mr. Deverse and Mr. Pyros that Daisy was not a pet, that she was a service animal. (Headlee, at 85.)

Mr. Cogley then joined the conversation on the speaker phone with Ms. Headlee. (Headlee at 76. 85.) Mr. Pyros and Mr. Deverse repeated their complaint they had about Mr. Milan's pet dog to Mr. Cogley. (Headlee, at 76.) Mr. Cogley also explained to Mr. Deverse and Mr. Pyros that Daisy was a service animal. (Headlee, at 77.) Neither Mr. Deverse nor Mr. Pyros stated that Daisy was disturbing the other residents of the George Washington, that she was out of control, barking repeatedly, or that she was a threat to the health or safety of other persons. (Cogley, at 67-68; Headlee, at 76-77.) Their objection at the time was that they were unaware that Mr. Milan had a dog. (Headlee, at 76.)

Later that day Mr. Cogley met in person with Mr. Deverse and Mr. Pyros. (Cogley, at 46; Headlee, at 84.) Mr. Pyros explained to Mr. Cogley that the Hotel had a no pets policy, that he did not want any animals in the building, and that the dog could not be there. (Cogley, at 47.) Mr. Cogley again explained that Daisy was a service animal, not a pet. (Cogley, at 47, 60-61;

7

Transcript of hearing, April 2, 2008, testimony of Kathleen Kleinmann, at 30 (Doc. 25) (hereinafter "Kleinmann April 2, 2008".)  Mr. Cogley further stated that any dispute management had about Daisy should be directed to Mr. Milan, not TRIPIL Services.  (Cogley, at 47, 49.)  During this conversation there were no complaints from Mr. Deverse or Mr.  Pyros that Daisy was out of control, disturbing the other residents, barking repeatedly, or that she was a threat to the health or safety of other persons.  (Cogley, at 67-68.)  After the meeting Mr. Cogley informed Mr. Milan that the management had a problem with Daisy.  (Milan, April 2, 2008, at 105.)

At the end of her work day on January 8, 2008, Ms. Kleinmann placed a handwritten note on Mr. Deverse's desk requesting that her guest be added to the lease for a period of about two months.  (Kleinmann April 1, 2008 , at 113-114.)  At that time, Mr. Sykes had been in Ms. Kleinmann's apartment four days.

On January 9, 2008, general counsel for Pyrsquared Management, William Weiler, Jr., issued a letter to Ms. Kleinmann, which stated in relevant part as follows:

> As General Counsel for PyRsquared Management Company, Inc., general partner of The George Washington, L.P., I am writing regarding the unauthorized tenants you brought in to reside in your apartment this past weekend, and the pet apparently brought in with one of them.  Your lease does not permit you to run a hospice out of your apartment, or to provide housing for indigents.  As you made no application for these individuals, and their presence is unauthorized, we will not nor will we ever be providing additional keys to provide to these individuals, as per your request made yesterday to Mr. Ronald DeVerse, our General Manager.
>
> We are also hereby providing you with the ten day notice required by law to commence eviction proceedings.  Unless the unauthorized individuals and the pet are removed from your apartment and our Hotel by January 21, 2008, we will file a Landlord-Tenant action for eviction against you on January 22, 2008.  You are further advised that you and Triple [sic] Services are not to bring any additional tenants into the George Washington, without first making application for the proposed tenant for residency with Mr. DeVerse.  The building is our facility, and we steadfastly maintain the right to ascertain to whom we desire to rent.

(Plaintiff's Ex. 4.)

On January 11, 2008, Mr. Milan and Daisy traveled through the kitchen of the restaurant on his way to the hotel lobby.  (Transcript of hearing, April 4, 2008, testimony of Robert Milan, at 96-98 (hereinafter "Milan April 4, 2008")).)  According to Defendants, Daisy defecated just outside the service entrance to the kitchen.  (Hopkins, at 44.)  As a result, Defendants instituted a "triclean" on

the kitchen that cost $3,316.25. (Transcript of hearing, April 3, 2008, testimony of Kyrk Pyros, at 214-217 (hereinafter "Pyros April 3, 2008"); Pl. Ex. 5.) Defendants informed Ms. Headlee and Mr. Cogley that the Hotel had video surveillance tape of Daisy defecating in the Hotel. (Headlee, at 78; Cogley at 63).

On January 14, 2008, Mr. Pyros and Mr. Deverse arrived at Mr. Milan's apartment to discuss the weekend incident. (Milan April 2, 2008, at 107; Kleinmann April 1, 2008, at 121-122.) Ms. Kleinmann was present at Mr. Milan's apartment when the two men arrived, and had just finished signing a letter addressed to Mr. Deverse dated January 14, 2008. (Milan April 2, 2008, at 107; Kleinmann, April 1, 2008, at 121-122.) In this letter, Mr. Milan indicated that he was looking forward to moving into Unit 1005, that he had a service dog for which he was requesting a reasonable accommodation, and that he also required certain alterations in the interior of the apartment that he would pay for. (Pl. Ex. 6.) It was explained to Mr. Pyros and Mr. Deverse that Daisy was a service dog, and the letter was given to either Mr. Deverse or Mr. Pyros. (Milan April 2, 2008, at 108, 110; Kleinmann, April 1, 2008, at 122-123, 124; Transcript of hearing, April3, 2008, testimony of Ronald Deverse, at 96 (hereinafter "Deverse April 3, 2008").) Later that day, Mr. Deverse delivered a credit application to Mr. Milan by slipping it under his apartment door. (Deverse April 3, 2008, at 97, 98-99.)

On January 15, 2008, Ms. Headlee was asked by Mr. Deverse to come to the Hotel to pick up the video surveillance tape of Daisy defecating in the Hotel over the weekend. (Headlee, at 78-79.) When she arrived she saw law enforcement personnel talking to Mr. Deverse, Mr. Weiler, and Mr. Milan. (Headlee, at 79). The officers had been summoned by Mr. Weiler to evict Mr. Milan as a squatter. (Headlee, at 79-80.) The officers explained to Mr. Deverse and Mr. Weiler that they could take no action without a court order. (Headlee, at 80). Mr. Deverse then gave Ms. Headlee a photograph allegedly depicting feces in the snow. (Headlee, at 81.)

On January 17, 2008, Mr. Weiler issued two letters, one to Mr. Milan, and one to Ms. Kleinmann at TRIPIL Services office address. (Pl. Exs. 9 & 8.) Mr. Milan was informed that he was to remove himself from the hotel or face eviction proceedings as he was not an authorized

tenant. (Pl. Ex. 9.) There was no mention in this letter regarding Mr. Milan's dog, there were no references to any complaints by other tenants, and no mention of the incident in the kitchen over the weekend.

Ms. Kleinmann was told that she brought Mr. Milan into the building under the false pretense that TRIPIL Services would execute a lease for him. (Pl. Ex. 8.) The January 17, 2008 letter also indicated to Ms. Kleinmann that Mr. Milan was unable to care for his dog and that the dog was defecating in the Hotel and on the exterior of the property. (Pl. Ex. 8.) Finally, Mr. Weiler notified Ms. Kleinmann that it would cease doing business with TRIPIL Services and those individuals that TRIPIL Services represents. (Pl. Ex. 8.)

On January 21, 2008, Mr. Sykes left Ms. Kleinmann's apartment. (Kleinmann April 2, 2008, at 15, 20, 25.)

On January 22, 2008, the George Washington, L.P., filed Landlord and Tenant Complaints for recovery of real property against Ms. kleinmann and Mr. Milan in Magisterial District No. 27-1-01 in Washington County, Pennsylvania. (Pl. Exs. 11 & 12.)

Defendants also testified that on January 25, 2008, while giving tours of the Hotel to dinner guests at a five-course white glove dinner, Mr. Pyros and Mr. Deverse witnessed Daisy defecate on the oriental rug in the Hotel lobby while Mr. Milan waited, and that Mr. Milan entered the elevator without cleaning up the feces.

On February 15, 2008, Ms. Kleinmann, in anticipation that Mr. Sykes would be discharged from the hospital later that month, requested permission in writing that Mr. Sykes be permitted to return to her apartment as a guest and be added on the lease. (Kleinmann April 2, 2008, at 23-24; Pl. Ex.16.) By letter dated February 20, 2008, Mr. Weiler indicated that Ms. Kleinmann's request was denied. (Pl. Ex. 17.) Nonetheless, Mr. Sykes returned to stay with Ms. Kleinmann on February 29, 2008, when he was discharged from the hospital. (Kleinmann April 2, 2008, at 20.) On March 7, 2008, Mr. Sykes was moved to a medical facility. (Kleinmann April 2, 2008, at 20.)

## II.  APPLICABLE LAW

### A.  Preliminary Injunction

Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.  <u>Allegheny Energy, Inc. v. DQE, Inc.</u>, 171 F.3d 153, 158 (3d Cir.1999); <u>ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.</u>, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc).  The court need only consider factors three and four if relevant or if the first two factors have been met.  <u>Tenafly Erev Ass'n, Inc. v. Borough of Tenafly</u>, 309 F.3d 144, 157 (3d Cir.2002); <u>AT & T v. Winback & Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 (3d Cir.1994).

### B. Fair Housing Amendments Act

Congress enacted the Fair Housing Act ("FHA")  in 1968, making it illegal to discriminate, in housing practices, on the basis of race or national origin.  <u>See</u> 42 U.S.C.  3601 *et seq.*   In 1988, Congress amended the Act so as to extend protection of the FHA to include people with disabilities. 42 U.S.C. § 3604(f).  Under the FHAA it is unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of-
>
> > (A) that person; or
> > (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> > (C) any person associated with that person.

42 U.S.C. § 3604(f)(2).

<u>Community Services, Inc. v. Wind Gap Municipal Authority</u>, 421 F.3d 170, 176 (3d Cir. 2005).

In order to make out a claim for a Fair Housing Act violation Plaintiffs must show:

> (i)  that plaintiff is suffering from a disability as defined under 42 U.S.C. § 3602)h)(1);
>
> (ii) that Defendants knew or reasonably should have been expected to know of the disability;

11

( iii) that reasonable accommodation of Plaintiff's disability might be necessary to afford him an equal opportunity to use and enjoy his dwelling; and

(iv) that Defendants refused to make a reasonable accommodation.

U.S. v. Port Liberte Condo 1 Ass'n, Inc., 2006 WL 2792780, *5 (D.N.J. 2006) (citing United States v. California Mobile Home Park Mgt. Co., 107 F.3d 1374, 1380 (9th Cir.1997)).  "[U]nder 42 U.S.C. § 3604(f)(3)(B), discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.'"  Community Services, Inc, 421 F.3d at 176.

Plaintiffs alleging violations of the FHAA under these sections may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make "reasonable accommodations," which arise under § 3604(f)(3)(B). See Lapid-Laurel [L.L.C. v. Zoning Bd. of Adjustment,] 284 F.3d [442,] 448 n.3 [(3d Cir.2002)].  To evaluate these claims under the FHAA, courts have typically adopted the analytical framework of their analogues in employment law, including their coordinate burden-shifting analyses once plaintiff has made a prima facie showing of discrimination under a specific claim.

Community Services, Inc, 421 F.3d at 176.

"Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a "motivating factor" behind the challenged action."  Community Services, Inc, 421 F.3d at 177 (citing Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs, 257 F.Supp.2d 208, 225 (D.D.C.2003) ("It is well settled that a defendant's decision or action constitutes disparate treatment, or intentional discrimination, when a person's disability was a 'motivating factor' behind the challenged action or decision.") (other citations omitted).  "The discriminatory purpose need not be malicious or invidious, nor need it figure in "solely, primarily, or even predominantly" into the motivation behind the challenged action."  Community Services, Inc, 421 F.3d at 177 (citations omitted).  "The plaintiff is only required to 'show that a protected characteristic played a role in the defendant's decision to treat her differently.'"  Community Services, Inc, 421 F.3d at 177 (quoting Cmty. Hous. Trust, 257 F.Supp.2d at 225.)

Courts have also "developed a 'proxy' theory" for evaluating facially discriminatory classification claims, "recognizing that a regulation or policy cannot 'use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination,' such as classifications based on gray hair (as a proxy for age) or service dogs or wheelchairs (as proxies for handicapped status)." Community Services, Inc, 421 F.3d at 177-178 (quoting McWright v. Alexander, 982 F.2d 222, 228 (7th Cir.1992)).

## III.   DISCUSSION

Based on our review of the evidence and testimony we conclude that all Plaintiffs have established a reasonable likelihood of success on the merits.  Plaintiffs Kathleen Kleinmann and TRIPIL Services are also able to establish irreparable harm.  We further conclude that the issuance of a preliminary injunction in favor of these Plaintiffs will not result in greater harm to Defendants, and that the public interest favors such relief.  Child Evangelism Fellowship of NJ Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir.2004).  Plaintiff Robert Milan, however, while able to establish a reasonable likelihood of success on the merits, is unable to establish that he will be irreparably injured by the denial of injunctive relief.

Our primary conclusion that Plaintiffs have established a reasonable likelihood of success on the merits depends on our determination of credibility.  Thus, we will begin by addressing the problems we found with Defendants' testimony that lessened their credibility, as well as the various inconsistencies in the evidence that show that Defendants' alleged nondiscriminatory reasons for the actions taken against Plaintiffs were a pretext for unlawful discrimination.

### A.  Credibility Determination

In general we found Defendants' primary witnesses to be not credible.  We make this ruling based, in part, on our observation of the witnesses' bearing and demeanor, the character of their testimony, and several inconsistencies and discrepancies in their testimony.  In general, a consistent theme in Defendants' testimony was a pattern of shifting their testimony in response to Plaintiffs' counsel eliciting potentially damaging evidence as the hearing progressed.  A significant, critical event that naturally would be presented on direct examination would go unaddressed by

Defendants, only to be acknowledged on redirect when Plaintiffs' counsel forced the issue. Our credibility determination also takes into account the testimony of all the witnesses, their motivations to testify less than truthfully, and how significant portions of Defendants' testimony was contradicted or inconsistent with other witnesses' testimony while Plaintiffs' testimony was consistent with and supported by other witnesses' testimony and the documentary evidence. Our discussion, while lengthy, does not address every instance showing Defendants' lack of credibility.

### 1. *Daisy as a Service Animal*

Both Mr. Pyros and Mr. Deverse testified that they had never seen Daisy wearing her service animal vest prior to January 14, 2008, and were never told by anyone that Daisy was a service animal until they received the January 4, 2008 letter from Mr. Milan. In contrast, Ms. Headlee and Mr. Cogley testified that each of them had immediately told both Mr. Pyros and Mr. Deverse that Daisy was a service animal as soon as they heard that Mr. Pyros and Mr. Deverse objected to her presence at the hotel. Both Mr. Cogley and Mr. Headlee presented themselves as credible witnesses. Moreover, it is credible to believe that each of them would inform anyone who objected to the presence of a disabled person's service animal that the animal was in fact a "service animal" given the work they do -- advocating on behalf of disabled persons. Indeed it would be surprising if they did not tell Mr. Pyros and Mr. Deverse that Daisy was a service animal, not a pet, when the two men initially objected to her presence. In addition, as we detailed below the testimony of both Mr. Deverse and Mr. Pyros is suspect in many areas. Thus, we find that Mr. Deverse and Mr. Pyros learned that Daisy was a service animal on January 8, 2008.

### 2. *Daisy' Presence in Court*

Throughout the four days of this hearing Daisy was present and did not defecate or urinate in the building, and she was barely noticeable unless attention was brought to her. She obeyed all Mr. Milan's commands and no one in the Courthouse reported any complaints about Daisy. Mr. Pyros testified that he was surprised that Daisy was so well behaved for the four days of the hearing, quickly clarifying "but he's been accompanied the entire time[,] Mr. Milan's door is always left open." (Pyros April 4, 2008, at 26.) We note that there was no direct evidence that

Daisy was ever seen unaccompanied and only one piece of hearsay evidence that a tenant saw Daisy unaccompanied.

In this regard we also note that Defendants offered no explanation as to why they did not produce any of the witnesses who lodged the numerous complaints with management about Daisy and Mr. Milan and chose instead to rest on hearsay evidence of such complaints.

### 3. Events leading up to January 9, 2008 Eviction Letter

Mr. Deverse recounts the events from late December through January 9, 2008 as follows. He testified that in late December he spoke with Ms. Kleinmann in person when she came to pay her rent. (Deverse April 3, 2008, at 66.) She inquired about someone she knew potentially seeking residence at the George Washington. (Deverse April 3, 2008, at 66.) At that time, Mr. Deverse had Mr. Martin show Ms. Kleinmann available units. (Deverse April 3, 2008, at 66.) Mr. Deverse had no further contact with anyone from TRIPIL until the first week of January when he spoke with Mr. Cogley. (Deverse April 3, 2008, at 70, 71.) Mr. Deverse then testified that his next contact was when Ms. Headlee called on January 4, 2008, seeking permission to have Mr. Milan move in the next day. (Deverse April 3, 2008, at 71-72.)

Mr. Deverse then prepared a lease for Unit 501 in the name of TRIPIL Services and had Mr. Martin deliver it to Ms. Kleinmann "first thing" Monday morning, January 7, 2008. (Deverse April 3, 2008, at 74.) During the course of the day on January 7th, Mr. Deverse received numerous complaints from tenants about a dog. (Deverse April 3, 2008, at 77, 82.) In addition, he received complaints about a potty chair left in the hallway on the fifth floor and that a previously evicted and banished TRIPIL Services tenant was back in the building. (Deverse April 3, 2008, at 77. 82.) As a result of these complaints Mr. Deverse attempted to contact Mr. Cogley on January 7, 2008, but was unsuccessful. (Deverse April 3, 2008, at 77, 82.) On January 8, 2008, Mr. Deverse and Mr. Pyros together telephoned TRIPIL services and spoke with Ms. Headlee. (Deverse April 3, 2008, at 83.) They relayed the complaints to Ms. Headlee who said she would pass the message to Mr. Cogley. (Deverse April 3, 2008, at 83.) Later that day, Mr. Cogley met with Mr. Deverse and Mr. Pyros in Mr. Deverse's office to discuss the complaints. (Deverse April 3, 2008, at 83-84.)

Because Mr. Cogley had said he would take care of the problems within a few days, Mr. Deverse "let it go for [] the week." (Deverse April 3, 2008, at 84.)

Mr. Deverse also testified that late in the day on January 9, 2008, he received the lease back from Ms. Kleinmann with a handwritten note on the envelope containing the lease. (Deverse April 3, 2008, at 76. 85.) Mr. Deverse claims that the note stated that the lease should be made out in the name of Robert Milan. (Deverse April 3, 2008, at 75, 86.) In addition, Ms. Kleinmann's note also included a request for "additional keys for caregivers and a guest in her room." (Deverse April 3, 2008, at 87.) Because he received the lease back late in the afternoon on the 9th, Mr. Deverse did not attempt to contact TRIPIL Services until January 10, 2008. (Deverse April 3, 2008, at 85.) When Mr. Deverse read the note stating that the lease should be made "written out to Mr. Milan" he "realized [he] had a problem", and therefore he "authorized William Weiler, our counsel, to issue a letter." (Deverse April 3, 2008, at 86.)

In Mr. Deverse's version of events he does not acknowledge that Ms. Kleinmann had several telephone conversations with him during the first week of January, 2008, in which she inquired as to whether Mr. Pyros had approved Mr. Milan's special requests. Mr. Deverse also does not acknowledge meeting with Mr. Milan on January 7, 2008 in the lobby of the hotel. (Deverse April 3, 2008, at 137, 146.) He does not acknowledge that after he and Mr. Pyros spoke with Ms. Headlee, that Mr. Cogley entered the telephone conversation whereupon Mr. Deverse and Mr. Pyros repeated the complaints they had been receiving to Mr. Cogley.

Mr. Deverse also does not acknowledge meeting with Ms. Kleinmann on January 7th when she arrived to pay her January rent and the two discussed the error in the lease and the issue of extra keys. He testified that he did have a discussion with Ms. Kleinmann when she was paying her January rent, but he stated that meeting took place in late December. As noted, however, Ms. Kleinmann was snowed-in in Ohio in late December and telephoned Mr. Deverse on January 1, 2008, to say that she would pay her January rent when she returned.

Ms. Kleinmann maintained that Mr. Deverse discussed the leases with her in the lobby of the George Washington on January 7, 2008, but never actually handed them to her because they

were incorrect based on Mr. Deverse's verbal representations.  Mr. Deverse testified that he gave an envelope with a lease in it to Howard Martin to deliver to Ms. Kleinmann's unit on January 7, 2008.  (Deverse April 3, 2008, at 74.)  However, Mr. Martin, who had already testified, was not asked to corroborate this event.

### 4. The January 9, 2008 Eviction Letter

The January 9, 2008 eviction letter contained no reference to the numerous complaints that management alleged they had been receiving about the dog in the building or about a potty chair on the fifth floor.  Mr. Pyros stated that he 'believe[d] that was probably the cause for the letter."  (Pyros April 1, 2008, at 30.)  However, Defendants were unable to offer any explanation as to why the letter did not refer to any of the complaints about the dog.

Defendants' initial justification for issuing the January 9th letter was that Mr. Deverse had received a handwritten note from Ms. Kleinmann on January 9th stating that the lease should be "written out to Mr. Milan."  (Deverse April 3, 2008, at 86.)  Mr. Deverse testified that he "realized [he] had a problem", since he believed that TRIPIL Services would be signing the lease, and therefore he "authorized William Weiler, . . . , to issue a letter."  (Deverse April 3, 2008, at 86.)  He later testified consistently that the January 9, 2008 eviction letter was initiated when he "got the lease back and was informed that Mr. Milan was to have the lease made out to him."  (Deverse April 3, 2008, at 169; see also 147-148 (January 9th letter was the result of having "given Kathleen Kleinmann a lease for TRIPIL Services," and Ms. Kleinmann "had returned the lease").)

However, the January 9th letter contains no reference to management's belief that TRIPIL Services, not Mr. Milan, was supposed to sign a lease, that they just learned that day TRIPIL Services did not intend to sign the lease, or that there was a miscommunication or misunderstanding of any kind.  At best, the letter refers to "unauthorized" individuals without providing any context to account for Mr. Deverse having just learned that the lease should be made out to Mr. Milan.

The Defendants also offered another basis for issuing the January 9th eviction letter: Ms. Kleinmann had an unauthorized guest, Mr. Sykes, staying in her apartment.  Mr. Deverse explained

that the January 9th letter ordered Mr. Sykes to be out of Ms. Kleinmann's apartment by January 21, 2008, because Ms. Kleinmann was "blatantly defying the contract that she signed." by having Mr. Sykes in her unit without written permission. (Deverse April 3, 2008, at 115.)

Mr. Deverse's initial testimony was that he first learned of Ms. Kleinmann's guest through a written request he received from Ms. Kleinmann on January 9, 2008. Mr. Sykes had only been at Ms. Kleinmann's apartment since January 5, 2008, and her lease provides for tenants to have a guest for five days in any given month. (Pl. Ex. 3, at ¶ 9.) If Mr. Deverse only learned about Mr. Sykes stay at the apartment on January 9, 2008, issuing an eviction notice that same date appeared to be an over-reaction. To compensate for this appearance the Defendants attempted to rely on a strict application of Paragraph 9 of Ms. Kleinmann's lease. Paragraph 9 states:

> Rental unit shall be used solely as a private residential dwelling and occupied solely by those persons listed to be the occupants on tenant's rental application. Any other person/s residing in rental unit, before obtaining written consent of Landlord, shall be a breach of the terms and conditions, and a forfeiture of this lease agreement. Landlord at Landlord's sole option may end this lease agreement by notice in writing and Tenant may have not further right to possession of rental unit if occupied by any person not listed herein for longer than 5 days in any calendar month.

(Pl. Ex. 2, at ¶ 9.)

There are several problems with this justification. First, the letter does not mention Paragraph 9 of the lease. Second, Paragraph 9 clearly states that the Landlord may end the agreement by sending written notice *only* if a person occupies the unit "for longer than 5 days in any calendar month," and Ms. Kleinmann had not violated this condition as of January 9, 2008. Third, even assuming that the above two problems did not exist, Defendants failed to explain why their first response to the alleged violation was the drastic remedy of eviction when they admitted that they had had a good working relationship with Ms. Kleinmann for years and had in the past permitted her to have overnight guests without first obtaining written permission. Finally, the letter states that Ms. Kleinmann had not made application for these individuals, but Mr. Deverse admitted that Ms. Kleinmann had made application for Mr. Sykes at least in the note he received on January 9, 2008.

Counsel for defense attempted to remedy this last problem by eliciting testimony to show that Ms. Kleinmann had actually orally requested permission to bring Mr. Sykes in as her guest prior to January 5, 2008, but management never gave her such permission. In that case, according to Defendants, Ms. Kleinmann had violated her lease merely by bringing Mr. Sykes into her apartment as a guest in spite of the fact that management had not given her written permission. Thus, when Mr. Deverse received the note from Ms. Kleinmann asking for keys for Mr. Sykes and his caretakers, Defendants viewed the written note as an admission that she had broken the rules.

To develop this argument, counsel asked Mr. Deverse if Ms. Kleinmann had "ever discussed or had any conversations with you about this individual, Mr. Sykes?" (Deverse April 3, 2008, at 106.) Mr. Deverse at first does not answer this direct question, but instead responds consistent with his previous testimony that Ms. Kleinmann had communicated in writing a request for Mr. Sykes to stay with her. (Deverse April 3, 2008, at 106.) Counsel followed-up this response by asking directly "did you have any telephone conversations [with Ms. Kleinmann] first" about Mr. Sykes staying at her apartment. (Deverse April 3, 2008, at 107.) Again, consistent with his prior testimony Mr. Deverse answered, "No." (Deverse April 3, 2008, at 107.)

Shortly thereafter, counsel assisted Mr. Deverse by asking him the leading question "you were present when Mrs. Kleinmann [testified that] she called you sometime in late December and said she had a person - -." (Deverse April 3, 2008, at 107.) Mr. Deverse apparently understood at this point that it was acceptable to admit to this conversation as he answered before the question was completed stating, "yeah. She said she was having somebody come stay with her for a couple of days." (Deverse April 3, 2008, at 107.) Mr. Deverse goes on to testify that no one from the George Washington had ever given Ms. Kleinmann permission to bring Mr. Sykes in as a guest.

The problems with this justification are by now apparent. First, Mr. Deverse had to adjust his testimony to make this defense more plausible, thereby calling into question his prior testimony of when he first heard that Ms. Kleinmann sought to bring a guest to her apartment. In addition, Mr. Deverse's prior testimony appeared to be carefully crafted to avoid admitting that he ever had any telephone conversations with Ms. Kleinmann about the relevant issues of this action since he

simply did not acknowledge these conversations. Specifically, Ms. Kleinmann had testified that she had had two telephone conversations with Mr. Deverse about Mr. Sykes, one on January 1st and one on January 4th. (Kleinmann April 1, 2008, at 110-111.) Mr. Deverse did not admit to these conversations previously, but now he was admitting to at least one conversation that he had with Ms. Kleinmann about Mr. Sykes before January 5, 2008.

Second, even assuming Mr. Deverse's version is correct, this justification also does not address the harsh remedy of an eviction as a first response in light of the parties' prior agreeable relationship and the fact that they had permitted guests to stay with Ms. Kleinmann in the past. Finally, Defendants again run into the plain language of Paragraph 9 that allows a tenant to have a guest occupy their apartment for five days in any given month. Any other interpretation of this section is strained at best.

As is apparent, setting forth Defendants' various justifications and explanations for issuing the January 9, 2008 letter is complicated. In contrast, the explanation for the issuance of the letter offered by Plaintiffs is the simple explanation that the Defendants issued the letter because they objected to Mr. Milan's dog.

Defendants also argue that the "by January 21, 2008" deadline given to Ms. Kleinmann in the January 9, 2008 letter actually meant "no later than" January 20, 2008. We reject Defendants' unique interpretation that "by" actually means "before." Initially, we note that by setting a deadline Defendants were offering implicit, if grudging, permission for Mr. Sykes to remain in Ms. Kleinmann's apartment until the deadline. In addition, Defendants were explicit that legal action would only be taken if the deadline was not obeyed. Ms. Kleinmann complied with the common sense interpretation of the directive in the letter as Mr. Sykes left Ms. Kleinmann's apartment on January 21, 2008. Even under Defendants' interpretation that Mr. Sykes should have been out by midnight on January 20th, we cannot say that amounts to a "blatant" violation of the lease justifying immediately seeking the drastic remedy of eviction.

### 5. Mr. Milan's Interest in Unit 1005 was Known By Mr. Deverse

Defendants maintain that they always believed that Mr. Milan was a client of TRIPIL

Services until January 9, 2008, when Ms. Kleinmann informed Mr. Deverse that Mr. Milan would be signing his own lease. Mr. Deverse, however, revealed that he knew that Mr. Milan was at least interested in renting his own apartment at the hotel:

> Q. Did Milan say that - - wasn't Milan going to reside in 1005?
> A. My understanding, was that he was short-term, and if he was able - - I know what TRIPIL does, and they keep - - they get people ready to go out and get apartments and what not.
>  My understanding was, if he was going to do that, he might be interested in 1005.
> Q. Okay. Who conveyed that to you; Ms. Kleinmann, or Cogley, or who?
> A. Both. I had a meeting with both. They toured, both.

(Deverse April 3, 2008, at 136-137.) More specifically, Mr. Deverse knew that if Mr. Milan were going to rent Unit 1005, he would be doing so not long after he moved in:

> Q. Was there any conversation between you and Miss Kleinmann about Mr. Milan moving into that apartment [Unit 1005]?
> A. They had stated that he might be interested in that apartment.
> Q. And that temporarily he would be in 501 until that?
> A.  . . .  what I was led to believe, he was under their care. So I'm assuming a month, two months. That's how long I usually see a tenant that they have in their intermediate apartment.

(Deverse, April 3, 2008) at 180-181.)

The above testimony reveals that Mr. Deverse knew that Mr. Milan was interested in his own apartment perhaps within two months, which severely undercuts his outrage that TRIPIL Services had misled him. In other words, rather than Mr. Deverse suddenly finding out that TRIPIL was not signing a lease for Mr. Milan on January 9, 2008, as he testified, he in fact knew that Mr. Milan was contemplating obtaining Unit 1005 for himself, perhaps in February or March. One would think that upon hearing that Mr. Milan was actually going to be signing his own month-to-month lease in January, as opposed to two months later, that Mr. Deverse would have clearly explained the miscommunication to Mr. Weiler who then could have set forth any objection to Ms. Kleinmann and TRIPIL.

### 6. Ms. Kleinmann's Lease

Ms. Kleinmann's lease automatically renews unless written notice is given 30 days in advance, or on or about January 2, 2008. (Pl. Ex. 6.) Counsel for Plaintiffs pointed out that no one had given the required 30 days notice to Ms. Kleinmann that her lease would expire at the end of

her term. (Kleinmann, April 1, 2008, at 131; Deverse April 3, 2008, at 171-172.)

Defendants responded to this failure of notice by attempting to argue that they believed the lease had terminated as a result of Ms. Kleinmann's failure to remove Mr. Sykes before January 21, 2008. (Deverse April 3, 2008, at 123.) Mr. Deverse was testifying regarding a February 20, 2008 letter from Mr. Weiler to Ms. Kleinmann in which he stated that Mr. Sykes had "utilized his allotted five days," and that if Mr. Sykes returned to stay at her apartment Defendants would institute ejectment proceedings against Ms. Kleinmann "for [her] violation of the lease." (Def. Ex. L.)

Defendants' argument fails for the reasons already given regarding the deadline of Janaury 21, 2008. Moreover, the February 20, 2008 letter, cannot be read in any manner but that from Defendants' viewpoint Ms. Kleinmann's lease had not expired. In this letter, Mr. Weiler threatened that "if Mr Sykes is seen on the property in other than a temporary basis, we will institute ejectment proceedings against you for your violation of the lease, which is due to expire on February 29, 2008." (Def. Ex. L.) There was testimony that the reference to February 29, 2008 was a typographical error, as Ms. Kleinmann's lease actually had an end date of February 1, 2008. The typographical error, however, does not diminish the fact that Mr. Weiler considered that Ms. Kleinmann's lease had not yet expired. In fact the very next sentence includes the phrase "once your current lease expires," clearly indicating that general counsel for Defendants who had been directly involved in this matter since January 9, 2008, did not at the time of the letter advance the theory that Ms. Kleinmann's lease had expired when she failed to have Mr. Sykes out of her unit before January 21, 2008.

### *7. January 15, 2008 Forcible Eviction Attempt*

On direct examination Defendants chose not to address their decision to call law enforcement to physically remove Mr. Milan on January 15, 2008, the day after they had received written notice that Daisy was a service animal. However, an explanation was necessary if Defendants wanted the Court to understand why law enforcement was contacted so quickly after Mr. Pyros had decided to give Mr. Milan a second chance when he gave him a credit application on

22

January 14, 2008.

Plaintiffs' counsel had elicited testimony on cross-examination that tended to show that the decision to offer Mr. Milan a "second chance" after receiving written notice that Daisy was a service animal was a pretext and not sincere. Part of that evidence was the fact that law enforcement were called to evict Mr. Milan less than 24 hours after Defendants had decided to give him a second chance.

Initially Defendants' justification for the quick action alternated between allegations that Mr. Milan had no right to be in the apartment because he was a squatter without a lease, and that he had failed to return a completed credit application within the 24-hour deadline. When asked on cross-examination, Mr. Deverse explained that they sought the assistance of law enforcement because Mr. Milan had not returned the credit application form slipped under his door the day before. (Deverse April 3, 2008, at 188.) Mr. Pyros explained that the reason was because "Mr. Milan is a squatter, was a squatter, still is a squatter." (Pyros April 4, 2008, at 72.) Neither of these justifications was a sufficient explanation for calling law enforcement so quickly, unless one also concluded that Defendants were not sincere in offering Mr. Milan a second chance.

To rebut the impression of a pretext, on redirect examination of Mr. Pyros the following exchange occurred:

> Q. . . . there's about a 24-hour period between when you gave them the credit application . . . to when the police show up.
>     Would that be accurate; somewhere?
> A. Yes.
> Q. In that range, maybe give or take a little bit of time.
>     Now, during that time, **were there any other incidents?**
>     **Did Mr. Deverse tell you - - did you learn from Mr. Deverse, or do you know if there were other incidents involving the dog?**
> A. I - - ah, *I'm having a tough time recalling*, to be honest with you.
> Q. Okay. If I showed you this picture that we've identified as Exhibit 7.
> A. All right. Okay.
> Q. **Do you recall when that photograph was taken?**
> A. Yeah. The next - - right, right. *The 24th*, right.
> Q. Okay. Were you here when Mr. - - were you here when Mr. Deverse testified, when he was testifying?
> A. Yes.
> Q. **Do you recall his testimony, that on that day the security guards of the building saw that dog defecating?**
> A. Yes.

> Q. And **they took this photograph of it on that day?**
> A. Yes.
> Q. Okay. And do you know - - and this photograph was given to Mrs., Mrs. Headlee of TRIPIL, at the time she came there, after the police showed up; is that right?
> A. Yes.
> Q. **So this defecation on the sidewalk, on your building sidewalk by that dog occurred before the police were called.** Would that be an accurate statement?
> A. Be more than an accurate statement.

(Pyros April 4, 2008, at 75-76 (emphasis added).)

The relevant substantive content of the testimony in the above exchange did not come from Mr. Pyros. Instead, Mr. Pyros testified that he did not recall learning of any incidents involving the dog within the 24 hours after Mr. Milan was given a credit application, and that the photograph marked as Exhibit 7 was taken on January 24th, not January 11th. Mr. Pyros then merely agreed with *counsel's* recitation of Mr. Deverse's prior testimony and *counsel's* conclusion that the photograph was taken before the police showed up.

Thus, counsel's theory, offered during redirect of Mr. Pyros, was that law enforcement was called for the additional reason that Daisy had defecated on the sidewalk outside the building the day after Defendants offered Mr. Milan the second chance. Even if this were actually Mr. Pyros' testimony, we find this explanation to be insufficient as a reason for calling law enforcement to forcefully evict Mr. Milan. In addition, the evidence only supports that Exhibit 7 was *given* to Ms. Headlee on January 15, 2008, but there was no evidence as to when the photograph was taken. The only suggestion that the photograph depicts dog feces that was deposited on January 15, 2008, came from defense counsel.

The simple explanation for calling law enforcement less than a day after a credit application was given makes common sense: Defendants were not sincere in offering Mr. Milan a "second chance." Mr. Pyros made this clear when he eventually testified that the reason he gave Mr. Milan a "second chance" was to avoid being sued for discriminating against Mr. Milan. He testified as follows:

> Q. Okay. And then you found out that it was a service animal.
> A. I was told it was a service animal, yes.
> Q. And then you changed your mind temporarily, or at least you wanted to give him

24

a chance.  that's what you testified to?

A.  Then I gave him an opportunity to fill out a lease.

Q.  Now, why was that?

A.  Because I didn't want to be here.

(Pyros April 4, 2008, at 62.)  In other words, Mr. Pyros' decision to give a credit application to Mr. Milan was not sincere; it was a pretext designed to be used as a later justification for evicting Mr. Milan because he had a service dog.

### 8.  *The Dog Defecation Incidents*

There was lengthy testimony regarding alleged incidents in which Daisy defecated in the Hotel on January 11, 2008, and January 25, 2008.  The January 11th incident was alleged to have occurred in the evening after Mr. Milan traveled through the kitchen with Daisy, and Daisy allegedly defecated just outside the service entrance way to the kitchen.  The January 25, 2008 incident is alleged to have occurred in the evening during a "white glove" dinner when Daisy defecated on the oriental rug in the Hotel lobby.

The Complaint in Ejectment filed against Mr. Milan in the Washington County Court of Common Pleas does not allege that anyone witnessed the dog defecating in the hotel lobby on January 25, 2008.  (Pl., Ex. 18, at ¶¶ 39-40.)  Mr. Pyros initially testified that only he had witnessed Daisy defecating on the rug in the lobby on January 25, 2008 while he was giving a tour.  (Pyros April 1, 2008, at 65.)  He made no mention that Mr. Deverse was present at the time, a circumstance of sufficient significance that one would think would be mentioned.   (Pyros April 1, 2008, at 65.)  Mr. Pyros testified that he diverted the tour guests he was guiding to the Washington Room, and told security to clean up the feces and take a photograph of the feces. (Pyros April 1, 2008, at 65.)

Later in the hearing, Mr. Deverse testified that both he and Mr. Pyros were walking through the lobby while leading tours during the evening of January 25, 2008.  (Deverse April 3, 2008, at 125, 193.)  He testified that upon witnessing the defecation he and Mr. Pyros diverted the tour groups and that Mr. Deverse, not Mr. Pyros, "notified security, and in return, they went and cleaned up the mess."  (Deverse April 3, 2008, at 125, 193.)  When Mr. Pyros returned to the stand on the

fourth day of testimony he now testified that both he and Mr. Deverse saw Daisy defecate on the rug. (Pyros April 4, 2008, at 4.)  This was a relatively minor inconsistency in the testimony regarding the defecation incidents compared to the inconsistencies and discrepancies we discuss next.

### a. Photographic Evidence

With regard to the January 25, 2008 incident, Defendants introduced supporting evidence in the form of two photographs dated April 1, 2008, showing stains on the oriental rug in the lobby allegedly caused by Daisy defecating on the rug.  (Deverse April 3, 2008, at 126-129; Def. Exs. S & T.)  Direct examination ended without any testimony by Mr. Deverse that he had ever taken a photograph on January 25, 2008, of the dog feces on the oriental rug, and without any testimony that he had told anyone else to take a photograph of the feces.  On cross-examination, Mr. Deverse was asked why the April 1, 2008 photograph was dated so long after the event occurred on January 25, 2008.  (Deverse April 3, 2008, at 173.)  For the first time Mr. Deverse volunteered that he does in fact have pictures of the rug on his phone. (Deverse April 3, 2008, at 174.)

Later in his testimony he was asked if he had ever taken a contemporaneous photograph of either the January 11th or January 25th incident.  (Deverse April 3, 2008, at 207-208.)  He first explained that no photograph was taken on January 11th when Mr. Hopkins cleaned up the dog feces.  (Deverse April 3, 2008, at 208.)  With regard to the January 25th incident he explained that "our security guard was instructed to, please pick up the feces."  (Deverse April 3, 2008, at 208.)  Counsel for Mr. Milan then specifically asked if there was a photograph taken of the January 25th incident.  (Deverse April 3, 2008, at 208.)  However, this time Mr. Deverse did not testify as he had previously that he had pictures on his mobile phone, instead he stated that the photographs "are on two employees' phones."  (Deverse April 3, 2008, at 208.)

On redirect examination, however, Mr. Deverse's counsel immediately asked him "are any photos on your phone of that stain after - - or this dog poop shot, I guess?"  (Deverse April 3, 2008, at 208-209.)  Mr. Deverse testified that he *believed* there were photographs of the January 25th incident on his phone, but he was not sure.  (Deverse April 3, 2008, at 209.)

26

Because Mr. Deverse's mobile phone had been checked in with courthouse security his counsel asked if it would "be possible for [Mr. Deverse] to go down and check his phone, and have permission to bring his phone upstairs if it's on there?" (Deverse April 3, 2008, at 209.) Mr. Deverse left the courtroom with Mr. Weiler, while Mr. Pyros took the stand. Although Mr. Deverse returned to the courtroom before testimony concluded, the Court was never informed that he had found any photographs on his mobile phone.

When testimony resumed the following morning Mr. Pyros testified regarding two photographs "taken by Ron Deverse on his phone the night of the incident that we saw the dog defecate right on the Oriental rug in front of the lobby." (Pyros April 4, 2008, at 4; Deverse April 4 2008, at 84.) Mr. Pyros testified that he had directed Mr. Deverse to take the photographs. (Pyros April 4, 2008, at 4.) Mr. Pyros then testified that he was present at the time the photographs were taken, that he had directed Mr. Deverse and the security guard to take photographs, and that he had checked the photographs that night to make sure they showed what he wanted them to show. (Pyros April 4, 2008, at 5; see also at 51-52 (testifying that the focus was on getting a picture).)

Mr. Pyros explained that the two photographs were text-mailed to him by Mr. Deverse who apparently was unable to arrive until later in the hearing. (Pyros April 4, 2008, at 5.) However, Mr. Pyros did not produce his mobile phone to show that the pictures Mr. Deverse sent to him were actually on his phone. Similarly, although Mr. Deverse returned to the stand after the copies of the photographs were introduced during Mr. Pyros' testimony, Mr. Deverse also did not produce his mobile phone to reveal the existence of the photographs he had taken on January 25, 2008. Defendants had introduced copies of the photographs, and it was not required that they do more. However, digital photographs on mobile telephone typically include data regarding the date and time the photograph was taken. Such evidence surely would have lent more weight to Defendants' evidence.

Curiously, Mr. Deverse testified that one of the April 1, 2008 photographs depicted "a stain, which we had to leave there, you know, for proof with this, after we cleaned it up." (Deverse April 3, 2008, at 126-127; Def. Ex. S.) He did not testify that the stain was permanent. Thus, the fact

that the stain occurring in January 2008, was still there on April 1, 2008, is explained as a need to maintain evidence of the incident. Unaddressed was the question of why Defendants would choose to permit this stain to remain on its lobby carpet in light of the testimony regarding how important cleanliness and presentation are to George Washington management.

The Court also finds this curious given that Defendants have testified to nearly daily occurrences of Daisy urinating and defecating in and around the hotel, and had to this point introduced only the one unidentified and undated photograph of dog feces in the snow. In addition, Howard Martin, who testified to cleaning dog feces outside the hotel on a weekly basis, also admitted that he was never asked by management to document this activity in any way. (Martin, at 20.) The need to maintain proof of this one incident is an exception to the general lack of supporting documentation that characterizes Defendants' version of events.

Mr. Deverse also testified as to a second photograph of the same rug purporting to depict a second, different stain that occurred, in the words of counsel, "in the vicinity of the defecation that resulted in the January 11th?" (Deverse April 3, 2008, at 128-129; Def. Ex. T.) Mr. Deverse responded by stating "it's in that area." (Deverse April 3, 2008, at 129.) Thus, it appears that Mr. Deverse is testifying that the second stain on the oriental rug is the result of the January 11, 2008 incident that Mr. Hopkins testified occurred in the service entrance way between the kitchen and one of the banquet rooms. Mr. Deverse was also asked the following question on cross-examination about this photograph: "The stain on - - that's depicted by Exhibit T, you don't know that that was caused by the dog; do you?" (Deverse April 3, 2008, at 174.) Rather than answering this question directly Mr. Deverse stated only "I know it's a new stain," leaving open the possibility that in fact he does not know if it was caused by the dog. (Deverse April 3, 2008, at 174.) Given his testimony on other matters one would expect that had Mr. Deverse known that Daisy did cause the stain depicted in Exhibit T he would have emphatically stated so.

### b. An Employee Running over Dog Feces with a Food Cart

When Mr. Deverse was asked about the events of January 11, 2008, when Mr. Milan went through the kitchen, he stated:

> There was feces in the center of the side entrance, . . . , and one of the personnel in the kitchen was taking a cart from one kitchen to the other and didn't see it. Was pushing a big cart, service cart, and ran the feces through the hallway and started to go into the kitchen.

(Deverse April 3, 2008, at 91.) On cross-examination, Mr. Deverse's testimony remained consistent: that an employee had rolled a cart through dog feces on January 11, 2008. (Deverse April 3, 2008, at 159.) He further testified that as a result of the January 11th incident, not only was the entire kitchen sanitized, but also the "lobby was cleaned extensively because the cart did go through feces and was drug in our lobby, on a tile floor." (Deverse April 3, 2008, at 159.) More specifically, Mr. Deverse identified the employee as Mr. Hopkins and stated that he "ran the cart over it, and that's when he saw it, and then, he picked it up." (Deverse April 3, 2008, at 160.)

Mr. Deverse again testified consistently when cross-examined by Mr. Milan's counsel stating as follows:

> A. [Mr. Hopkins] saw the dog and Mr. Milan enter the kitchen, or go through the kitchen to exit the restaurant, and shortly after that, he was taking a cart out the same way that Mr. Milan went, exited our restaurant, through the kitchen, to another service kitchen, and there was feces there that the cart hit, and he discovered it and had to clean it.
> Q. And is that what he told you?
> A. Yes.

(Deverse April 3, 2008, at 181.) Later he testified that he heard about the January 11, 2008 incident when hotel staff called him at home and told him that "Mr. Milan had rolled through our kitchen with a dog, and that they found feces in our lobby." (Deverse April 3, 2008, at 184.)

It was later brought out during cross-examination that the Complain in Ejectment filed against Mr. Milan set forth the incident where the food cart ran over dog feces as follows:

> 39. On January 25, 2008, at approximately 6:30 p.m., Milan traversed through the lobby of the GW with his dog.

> 40. At that time, the dog defecated upon the antique wool rug located in the lobby of the GW.

> 41. Subsequently, the GW's employee, Lawrence Hopkins, who was unaware that the dog had defecated upon the rug, while traversing the GW's lobby with a food cart, stepped in the feces, and spread the feces about the rug and lobby.

(Pl. Ex. 18 ). Thus, not only did Defendants not include a particularly critical fact in its Complaint

29

against Mr. Milan -- that the owner and the manger of operations of the George Washington actually witnessed the dog defecating -- but also that the dog feces was run over with a cart on *January 25th*, not the 11th as Mr. Deverse had testified.

On redirect, Mr. Deverse admitted that either he may be mistaken or the drafter of the Complaint was confused with respect to which date the food cart ran over the dog feces, "because of so much staff that happened." (Deverse April 3, 2008, at 202.) Mr. Deverse's counsel then asked two questions to clarify the events:

> Q. Was there actually an incident where the food cart ran over, for lack of a better word, dog poop in the lobby?
>
> A. Yes.
>
> Q. Okay. Was there actually - - was there another day when the staff had to clean it up in the - - clean up the dog defecation on the lobby on other occasions?
>
> A. Yes.

(Deverse April 3, 2008, at 202-203.) Although the other "occasions" where staff had to clean up feces in the lobby were mentioned, the evidence only concerned two incidents: January 11th and January 25th.

Mr. Deverse never testified on direct examination that any employee had driven a cart through the dog feces on the oriental rug on January 25, 2008. However, when he returned to the stand the next day his testimony was suddenly consistent with the averments in the Complaint that Mr. Hopkins pushed a food cart through the lobby and ran through dog feces on *January 25, 2008.* (Deverse April 4, 2008, at 86.) Mr. Deverse's new testimony is inconsistent with his extensive prior testimony that the incident involving Mr. Hopkins and the food cart occurred on January 11, 2008.

Mr. Hopkins testified about Mr. Milan and Daisy going through the kitchen on January 11, 2008. (Hopkins, at 44.) He testified that he discovered dog feces outside the service entrance way. (Hopkins, at 44.) When asked, "what happened after you discovered the dog feces outside of the kitchen?" Mr. Hopkins stated, "I cleaned it up." ( Hopkins, at 57.) Mr. Hopkins did not testify that

he ever pushed a food cart through dog feces at any time, and he was never questioned about the January 25, 2008 incident.

Counsel for Plaintiffs pointed out this omission in Mr. Hopkins' testimony, to which Mr. Deverse responded by stating, "I don't think he was asked." (Deverse April 4, 2008, at 90.) The fact that Mr. Hopkins was not asked on direct examination about the time he ran through dog feces with a food cart, whether it occurred on January 11th or 25th, is a glaring, unexplained omission of a significant incident in Defendants' version of events.

This issue did not arise until Defendants' witnesses were cross-examined about an apparent smear of the dog feces in the photographs allegedly taken on January 25, 2008. The explanation was that Mr. Hopkins had run a food cart through the feces on January 25th. Mr. Deverse initially testified repeatedly and consistently that Mr. Hopkins ran through dog feces on January 11th. Mr. Hopkins never testified about dog feces on the oriental rug in the lobby on January 25, 2008; he only testified about the kitchen and the entrance from the kitchen to the lobby on January 11, 2008. He never testified that he ever ran through dog feces with a food cart. When faced with evidence presented in this manner it falls on the fact-finder to reconcile conflicting testimony by filling in gaps and attempting to make the evidence fit together insofar as possible. In this instance all of the testimony supports that Mr. Hopkins did run through some substance in the lobby with a food cart, but it is not at all clear when this happened, or where on the rug it occurred. We do not rule out that there is a sensible reconciliation of the inconsistent evidence regarding the January 11th and the January 25th incidents, but no such explanation was offered during the hearing.

This episode follows a consistent pattern of Defendants' testimony: they present evidence to support their valid lawful nondiscriminatory reasons for taking the actions they took against Plaintiffs; Plaintiffs' counsel elicits testimony revealing inconsistencies, unexplained gaps, or insufficient or confusing supporting explanations; then Defendants respond by developing new theories on re-examination of their witnesses, introducing completely new evidence, or taking other evidence and using it as an explanation for any alleged problems with the current testimony. This pattern was not confined to relatively minor evidence nor was it addressing understandable lapses

31

of memory. Our review of the testimony shows that this pattern addressed significant and critical evidence that typically would be addressed in Defendants' case-in-chief.

## B. Reasonable Probability of Success

We conclude that Plaintiffs have established a reasonable probability of success on the merits of their claim that Defendants have violated the FHAA. Initially we find that there is no dispute that Mr. Milan is disabled and that Daisy is a service animal as contemplated under the Americans with Disabilities Act. 28 C.F.R. § 36.104 ("Service animal means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability . . .")

Mr. Milan and the George Washington entered into an oral month-to-month lease that began on January 5, 2008. In addition to the standard terms of an oral lease in Pennsylvania, Mr. Milan's oral lease also includes the following additional conditions: that Mr. Milan would temporarily occupy Unit 501 while management prepared Unit 1005, at which time Mr. Milan would reside in Unit 1005; and the month-to-month lease was only valid for six months, or until July 4, 2008.

After becoming aware that Mr. Milan was accompanied by Daisy on January 7, 2008, Mr. Deverse and Mr. Pyros viewed Daisy's presence as a violation of the no pet policy of the hotel and decided to take steps to have both Mr. Milan and Daisy removed from the premises. A reasonable person viewing Mr. Milan in a wheelchair with his obvious limited ability to manipulate his arms, neck and head and accompanied by a dog would understand that the purpose of the dog was to assist Mr. Milan. Notwithstanding the obvious conclusion that Daisy is a service animal, Mr. Deverse and Mr. Pyros were informed at least three separate times on January 8, 2008, that Daisy was Mr. Milan's service animal. First, Ms. Headlee informed Mr. Deverse and Mr. Pyros that Daisy was a service animal during a conversation on January 8, 2008. Mr. Cogley then immediately reiterated that Daisy was a service animal when he joined the telephone conversation. Finally, Mr. Cogley informed Mr. Deverse and Mr. Pyros that Daisy was a service animal when he met with them in person on January 8, 2008.

32

Despite the fact that Defendants knew and should have known that Daisy was a service animal, they issued an eviction letter on January 9, 2008 seeking to evict both Mr. Milan and Ms. Kleinmann. We conclude that the January 9, 2008 eviction letter as to Mr. Milan was based on the fact that Mr. Milan's disability requires the use of a service dog that Defendants objected to and refused to accommodate, in violation of the FHAA. We further conclude that the January 9, 2008 eviction letter was based on retaliatory discrimination against Ms. Kleinmann because she was the person who referred Mr. Milan to Defendants as a potential tenant in violation of the FHAA.

Having concluded that Mr. Milan and Ms. Kleinmann have established that Defendants' initial motivation to remove them from the premises of the George Washington was based on illegal disability discrimination, failure to accommodate, and retaliatory discrimination, we further conclude, as set forth above, that the multitude of subsequent alleged lease violations are a pretext for the Defendants' initial discriminatory decision.

Defendants also sought to unlawfully retaliate against Plaintiff TRIPIL Services, and Ms. Kleinmann due to her relationship with TRIPIL Services, by seeking to evict TRIPIL Services. In addition, Defendants sought to retaliate against TRIPIL Services by stating that Defendants would no longer do any business with TRIPIL Services or with any prospective tenant referred by TRIPIL, and that any current tenant referred by TRIPIL Services would not be permitted to renew their leases. We conclude that Defendants' conduct towards TRIPIL Services was based on TRIPIL Services' provision of services to disabled persons and because of its association with Mr. Milan and Ms. Kleinmann, who is Chief Executive Officer of TRIPIL, in violation of the FHAA. Put more succinctly we conclude that Defendants' engaged in retaliatory discrimination against TRIPIL Services because of its association with Mr. Kleinmann who referred Mr. Milan and his service animal to Defendants.

Defendants argue that no FHAA violation occurred because Mr. Milan was unable to show that he was qualified to rent an apartment from the George Washington because he failed to prove his credit worthiness. Defendants support this argument by citing <u>Alexander v. Riga</u>, 208 F.3d 419 (3d Cir. 2000), *cert. denied*, 531 U.S. 1069 (2001). The relevant portion of this case regarding

creditworthiness concerned an evidentiary ruling upholding the District Court's exclusion of evidence of the plaintiffs' creditworthiness. <u>Alexander</u>, 208 F.3d at 435.

The defendants in <u>Alexander</u> sought to introduce evidence that the plaintiffs, the Alexanders, were not creditworthy. <u>Id.</u> The District Court excluded the evidence as not relevant, and the United States Court of Appeals for the Third Circuit affirmed. <u>Id.</u> Specifically, the defendants argued that the Alexanders "had to show that they were fully qualified to rent the apartment ultimately." <u>Id.</u> The Third Circuit Court disagreed finding that the Alexanders "only needed to show that they were qualified to be applicants, to view the apartment, and be treated no differently from other applicants." <u>Id.</u> The Court went on to explain that if the case "were about the Alexanders' unsuccessful apartment application and they could make a prima facie showing of discrimination, then the evidence of creditworthiness would indeed be relevant." <u>Id.</u>

Similarly, this case is not about an unsuccessful application of Mr. Milan's, therefore his creditworthiness is not relevant. Certainly after Defendants were presented with written notice that Daisy was a service animal they tried to establish a record that would allow them to claim that Mr. Milan was not creditworthy. By that time it was too late as the case was then about Defendants' desire to unlawfully evict Mr. Milan because he had a service animal.

### C. Irreparable Injury

#### 1. Kathleen Kleinmann and TRIPIL Services

We conclude that Ms. Kleinmann and TRIPIL Services will suffer irreparable injury if we deny their requested injunctive relief. TRIPIL Services provides services, including the use of a transitional unit in the George Washington, to other disabled individuals. TRIPIL Services' clients would be without housing were Defendants able to evict TRIPIL Services. In addition, both Ms. Kleinmann and TRIPIL Services have expended significant funds to modify their units in the George Washington in order to make them not only more accessible, but also to promote independent living for Ms. Kleinmann and TRIPIL Services' clients. Ms. Kleinmann is now able to live independently, in part, because of unique modifications to her apartment, the convenient location of the George Washington for a person in a wheelchair, and the ease of access for TRIPIL

Services where she works.  The eviction of Ms. Kleinmann will result in irreparable injury in part due to the loss of independent living and the use of the unique modifications in her apartment. If she and TRIPIL were evicted, it is probable that the existing units would no longer be available to them if they were ultimately to be successful in this litigation.

### 2.  Robert Milan

Mr. Milan is not in the same position as Ms. Kleinmann and TRIPIL Services.  He has resided at the George Washington for a little over nearly four months and he has not invested significant amounts of money to renovate his apartment.  He entered into an oral month-to-month lease that he knew would last no longer than six months, at which time he would either have to sign a lease or leave.  Finally, his counsel represented to the Court that Mr. Milan has recently begun to actively seek new housing and understandably does not desire to remain at the George Washington. Under these conditions we cannot say that Mr. Milan will suffer irreparable harm by denying injunctive relief in his favor.

### D.  Harm to Defendants

Defendants have not established that they will suffer greater harm by the granting of relief of to Ms. Kleinmann and TRIPIL Services.  Defendants rely primarily on their plans to convert apartment units to hotel rooms.  However, Ms. Kleinmann's  lease does not end until February 1, 2009, and TRIPIL Services' lease does not end until November 1, 2008.  Had the events in this action never occurred these leases would be valid until the term of the lease expired.  Presumably Defendants planned on properly terminating these leases when necessary in order to fulfill the Hotel's conversion plans.  Similarly, Ms. Kleinmann and TRIPIL Services were no doubt  well aware that their leases would eventually be terminated because of the Hotel's plans.

By imposing injunctive relief the Defendants are in exactly the same position as they were before issuing the January 9, 2008 eviction letter.  Defendants could have, but did not, previously give the thirty day notice terminating Plaintiffs' leases in accordance with the terms of the leases. In order for Defendants to have accomplished this they would have had to provide written notice to Plaintiffs before Mr. Milan and Daisy ever arrived at the George Washington.  The fact that the Defendants took no action until after Mr. Milan and Daisy arrived undercuts their claim that they

would be harmed by granting the requested relief.  In addition all Plaintiffs have deposited with the Clerk of Court the rent owed to Defendants and are under a continuing obligation to do so.

### F.  Public Interest

We find that the public interest favors the issuance of a preliminary injunction where, as here, enforcement of the FHAA is at issue, and where maintaining the status quo for Ms. Kleinmann and TRIPIL Services also promotes independent living for persons with disabilities.

## IV.  CONCLUSION

After careful review of the testimony and evidence from the hearing on Plaintiffs' motions for a preliminary injunction we conclude that a preliminary injunction in favor of Plaintiffs Kathleen Kleinmann and TRIPIL Services is appropriate.  In addition, a preliminary injunction in favor of Plaintiff Robert Milan is not warranted because he is unable to establish irreparable harm.

As detailed in our Opinion our ultimate conclusion is dependent on determinations of credibility as the parties' testimony was in conflict on nearly every issue.  Many unanswered questions remain in the Court's mind, however we must render a decision with the evidence before us.  We are aware that the urgency of the preliminary injunction hearing meant that the parties had little preparation time, and the testimony often took on the character of a discovery deposition rather than a polished witness examination.  The testimony and evidence at a full trial on the merits before a jury will no doubt be much smoother.

In this regard, the parties have indicated a preference for a shortened discovery period and a full trial sooner rather than later.  Defendants have filed motions to dismiss, and Plaintiffs have indicated that they intend to respond to these motions by filing an Amended Complaint to cure any defects identified by Defendants.  Plaintiffs response is now due no later than May 15, 2008. Whenever Plaintiffs file their Amended Complaint, Defendants will have 20 days within which to file their Answer.  In order to facilitate a shortened schedule the Court will issue a separate preliminary case management order permitting the parties to begin discovery, and we will also schedule an initial case management conference.  The parties are reminded that this action has been placed in the Court's Alternative Dispute Resolution Program.  (Doc. 2.

AND NOW, this ___5th___ day of May, 2008, as set forth in the Opinion accompanying this Order, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiffs' Motion for a Preliminary Injunction be and hereby is GRANTED in part and DENIED in part as follows:

1. Plaintiffs' Motion for a Preliminary Injunction is DENIED as to Plaintiff Robert Milan.

2. Plaintiffs' Motion for a Preliminary Injunction is GRANTED as to Plaintiff Kathleen Kleinmann and TRIPIL Services, Inc. as follows:

        a. Defendants shall refrain from engaging in any activity that would threaten, interfere with, or otherwise jeopardize the Plaintiffs leasehold and possessory interest in Apartment Units in the George Washington Hotel, 60 South Main Street, Washington, Pennsylvania, 15301.

        b. Defendants are restrained and enjoined from continuing with or commencing eviction actions against Plaintiffs.

        c. Defendants are enjoined from engaging in any activity that would interfere with the quiet and peaceful enjoyment of Plaintiffs.

        d. Defendants are enjoined from changing any term of the leases or from imposing any additional obligations on Plaintiffs.

        e. Defendants shall refrain from engaging in any conduct that constitutes harassment, retaliation, or other interference with Plaintiffs' rights to live in the George Washington Hotel, to associate with their lawyers, other disabled individuals, or members of the public, or to use the common areas of the Hotel.

37

f. This injunction is conditioned upon Plaintiffs continuing to post as bond with the Clerk of Court their respective monthly rental payment in a timely fashion and otherwise comply with the terms and conditions of their respective leases.

Maurice B. Cohill, Jr.
Senior United States District Judge

cc:     Counsel of record

38